ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| YAMIL WALID TORO TORO <br><br> Apelante <br><br> v. <br><br> BATTELLE MEMORIAL INSTITUTE, Y OTROS <br><br> Apelado | KLAN202400630 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Cabo Rojo <br><br> Caso Número: SJ2021CV05235 <br><br> Sobre: Procedimiento Sumario bajo la Ley 2 |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de septiembre de 2024.

Comparece Yamil Walid Toro Toro (Sr. Toro o apelante) y nos solicita la revocación de la *Sentencia* emitida el 8 de mayo de 2024 por el Tribunal de Primera Instancia, Sala de Cabo Rojo (TPI o foro primario)[1] en la que desestimó la demanda de epígrafe por la vía sumaria.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado. Veamos.

**I**

Battelle Memorial Institute (BMI o apelado) contrató al Sr. Toro como gerente de operaciones de campo, en el Dominio 4 de la Red de Observatorios Ecológicos Nacionales, sito en Guánica, Puerto Rico. BMI se dedica a recoger muestras para análisis y estudio sobre el calentamiento global y el cambio climático en diversas regiones de Estados Unidos de América y sus territorios. Lo antes, en calidad de

---

[1] Véase, Apéndice, pág. 40. Mediante *Orden* emitida el 18 de agosto de 2021 el caso fue trasladado de la Sala Superior de San Juan a la Sala Superior de Mayagüez.

contratista de la Fundación Nacional para las Ciencias de EE.UU. (National Science Foundation). En atención a una querella instada por otro empleado en contra del apelante y los hallazgos de una investigación interna, BMI despidió al Sr. Toro de su puesto. Por entender que, el despido fue injustificado y en represalias, el Sr. Toro instó una demanda contra BMI, al amparo de la Ley 80 de 30 de mayo de 1976, conocida como, *Ley de Indemnización por Despido sin Justa Causa*, 29 LPRA Sec. 185a y 185k(a), así como la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, conocida como, la *Ley de Represalia Contra el Empleado por Ofrecer Testimonio o Causa de Acción*. BMI acreditó su alegación responsiva en la que negó las alegaciones y, en síntesis, sostuvo que el despido obedeció a causa justificada. Así las cosas, a petición de BMI y sin objeción del Sr. Toro, el TPI autorizó ventilar la causa por la vía ordinaria.[2]

Culminados varios incidentes interlocutorios que no son necesarios pormenorizar, BMI presentó una *Moción de Sentencia Sumaria* el 27 de octubre de 2023.[3] En su petitorio consignó cien (100) propuestas de hechos incontrovertidos que, a su entender, fundamentan la desestimación del pleito sin la necesidad de celebrar un juicio en su fondo. Añadió que, la separación del empleo del Sr. Toro ocurrió luego de la aprobación de la Ley Núm. 4 de 26 de enero de 2017, *Ley de Transformación y Flexibilidad Laboral* (LTFL) la cual enmendó la Ley 80, *supra,* por lo que, conforme lo resuelto por el Tribunal Supremo en *Segarra Rivera v. Int'L. Shipping et al.,* 208 DPR 964, 987 (2022) y *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 775-776 (2022), no existe presunción de despido injustificado en este

---

[2] Apéndice pág. 63.

[3] Apéndice pág. 108-1276. Junto a su petitorio incluyó los siguientes documentos: Exhibit 1-Transcripción de Deposición de Yamil Walid Toro Toro celebrada el 12 de abril de 2023; Exhibit 1A-Transcripción de Deposición de Yamil Walid Toro Toro celebrada el 8 de junio de 2023 Exhibit 2-Políticas y Procedimientos, BS 391-392; Exhibit 3-Code of Business Ethics and Conduct; Exhibit 4-Expediente de Personal de Toro Toro; Exhibit 5-Statement Under Penalty of Perjury suscrita por Amanda Price y su Expediente de investigación; Exhibit 6-Statement Under Penalty of Perjury suscrita por Laureen Lunsford y su Expediente de investigación; y Exhibit 7- Statement Under Penalty of Perjury suscrita por Kirsten Ruiz y su Expediente de investigación.

caso. Planteó que, la evidencia sostiene que el demandante como supervisor, recibió quejas de los empleados supervisados sobre potenciales violaciones a las disposiciones reguladas por la agencia federal, Occupational Safety and Health Admnistration (OSHA) y no actuó conforme las normas de salud y seguridad pertinentes. A esos efectos indicó que, otro empleado, el Sr. Miguel Rivera instó una querella en contra del Sr. Toro. BMI atendió las alegaciones y como parte de los hallazgos de la investigación interna, constató que, al no actuar, el Sr. Toro incumplió su deber como supervisor y tampoco responsabilizó a los empleados que provocaron la situación de presunto peligro en el área de trabajo. En particular, sostuvo que, el apelante violentó disposiciones establecidas en los siguientes, a saber: *Ethic and Compliance Procedure, Code of Business Ethics and Conduct* y el *Standard of Conduct and Discipline Policy*, respectivamente. Destacó que, en claro menosprecio a las normas de BMI, el Sr. Toro recomendó a los empleados quejosos publicar fotos en WhatsApp para demostrar los problemas de seguridad en el área de trabajo, en lugar de tomar una acción correctiva. Asimismo, adujo que, el Sr. Toro no le asiste ningún remedio bajo la Ley 115, *supra*, ya que no estableció un caso *prima facie* de represalias.

BMI expuso que, en este caso, el Sr. Toro como supervisor, correctamente refirió una queja presentada por una empleada (Sra. Velázquez) en la cual denunció actos de hostigamiento sexual perpetrados contra ésta por otro empleado, el Sr. Miguel Rivera. Dicho referido fue realizado por el Sr. Toro después de que el Sr. Miguel Rivera presentara la referida queja interna contra el Sr. Toro. El patrono expuso que, el acto del Sr. Toro de referir la querella de hostigamiento sexual a sus propios supervisores y a la oficina de recursos humanos, no propició ninguna consecuencia. Reiteró que, el despido del Sr. Toro se relaciona a las violaciones de las reglas de la compañía y como resultado de la investigación de la queja

presentada por el Sr. Miguel Rivera. Por ello, suplicó que, el TPI desestimara ambas causas de acción incoadas en su contra.

En reacción, el Sr. Toro interpuso su oposición al petitorio sumario.[4] Previo a considerar las propuestas de hechos presentadas por BMI, arguyó que, la moción instada descansa sobre una declaración jurada "self serving" de una oficial de recursos humanos que no tiene conocimiento personal de los hechos. Destacó que, la prueba demuestra que BMI concluyó la investigación interna dos semanas luego de que el querellante fuera despedido. Además, puntualizó que, la carta de despido notificó una causa por la terminación de empleo basado en tomar represalias contra empleados, lo cual es distinto a lo expuesto en la moción de sentencia sumaria. A su entender, la moción -distinto a lo informado en la carta de despido- descansa principalmente sobre supuestas violaciones a las normas de OSHA y el abandono de funciones gerenciales. Por otro lado, informó que, el patrono cometió actos de expoliación al no producir evidencia favorable en las libretas y notas del demandante que se encuentran bajo el control exclusivo del patrono. Al objetar las múltiples propuestas de hechos promovidas por BMI, el apelante sostuvo que, ante la existencia de prueba de referencia y asuntos de credibilidad, existían controversias que impedían la adjudicación de la causa sumariamente.

BMI replicó por entender que, el Sr. Toro incumplió las formalidades exigidas por la Regla 36 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V., R. 36. Arguyó que, como cuestión de derecho, el Sr. Toro no logró controvertir las propuestas porque descansó en alegaciones conclusorias y especulativas, sin presentar prueba que controvirtiera lo establecido en la moción promovida por el patrono.

---

[4] Apéndice págs. 1303-2260. Con su oposición incluyó los siguientes documentos: Exhibit 1-Declaración jurada suscrita por Yamil Walid Toro Toro; Exhibit 2-Transcripción de la Deposición de Yamil Walid Toro Toro celebrada el 12 de abril de 2023; Exhibit 3- Transcripción de la Deposición de Yamil Walid Toro Toro celebrada el 8 de junio de 2023; Exhibit 4-Equal Employment Opportunity Policy; y Exhibit 5-Standard of Conduct and Discipline Policy.

Puntualizó que, las declaraciones juradas, incluidas por BMI, son basadas en el récord de negocio y resultan admisibles en evidencia. Expuso que, el motivo del despido, según la prueba documental unida a su petitorio demuestra que, el Sr. Toro fomentaba un ambiente represivo entre los empleados bajo su cargo, lo cual es inconsistente con la política anti-represalias de la empresa, lo cual surge de la carta de despido. Aclaró que, nada estuvo motivado por su participación incidental en el referido de la queja sobre hostigamiento sexual.[5]

En reacción, el Sr. Toro acreditó un *Suplemento a la Oposición a Sentencia Sumaria*[6] en la que unió una nueva declaración jurada para demostrar referencias a segmentos de su propia deposición, en aras de fundamentar su oposición a la moción de sentencia sumaria promovida por BMI.

Evaluadas las mociones de las partes, el TPI declaró ha lugar la solicitud de sentencia sumaria instada por la parte apelada y consignó determinaciones de hechos. A continuación, destacamos algunas, a saber:

> […]
> 11. Durante su relación de empleo con Battelle el demandante ocupó la posición de Gerente de Operaciones de Campo en el Dominio de Puerto Rico localizado en Guánica.
>
> 12. Dentro de la estructura interna de Battelle en tal Dominio, mediante la posición del demandante como Gerente de Operaciones de Campo este fungía como Domain Manager.
>
> 13. Los Domain Managers en Battelle establecen una matriz para el Dominio que dirigen definiendo las responsabilidades inherentes de cada puesto bajo su dirección.
>
> 14. Como Domain Manager del Dominio ubicado en Guánica el demandante tenía todo el personal del Dominio a su cargo.
> 15. Miguel Rivera ("Rivera") era un "lead" asignado al "IS" como "Field Ecology 3". Rivera lideraba, bajo la supervisión de Toro, el área de instrumentación tanto terrestre como acuática.

---

[5] Apéndice págs. 2268 2281.
[6] Apéndice págs. 2283-2294.

16. Tatiana Velázquez ("Velázquez") era una "Field Technician Lead" asignada al "IS", pero también brindaba apoyo a varios sistemas de acuerdo con la necesidad.

17. El demandante, al estar a cargo del Dominio, además de supervisar a los "leads", también supervisaba los empleados que apoyaban a los "Leads" que se tratase en la implementación del área del protocolo correspondiente al "lead" en el Dominio.

[…]

19. El demandante conocía durante su relación de empleo con Battelle que esta tenía varías políticas relacionadas con el empleo, tales como el Código de Ética y Conducta de Negocios, la Política contra el Hostigamiento Sexual, y la Política de "TimeKeeping".

20. Como persona a cargo del Dominio de Guánica, el demandante estaba familiarizado con las políticas de Battelle y era responsable de velar por el cumplimiento de las mismas por parte de los empleados a su cargo en el mencionado Dominio.

[…]

22. El demandante asimismo era responsable de monitorear que cada empleado estuviese cumpliendo con su descripción de tareas.

23. En ese sentido, si el demandante identificaba deficiencias o problemas de conducta o de desempeño en sus empleados debía hacer el señalamiento a Ruiz.

24. Ello, pues, el demandante tenía la responsabilidad de referir a un "upper manager", aquí a Ruiz o a Ritz, cualquier deficiencia en desempeño o cualquier problema de conducta de sus supervisados que requiriese investigación o disciplina.

25. Una vez se tomaba una determinación en relación al referido, se le enviaba al demandante el documento relacionado a la determinación disciplinaria tomada por Ruiz o Ritz para que este la ejecutara. A efectos de esa ejecución, en caso de un despido, el demandante debía seguir un protocolo consistente en informar al empleado a despedirse que estaba despedido, que tenía que entregar las llaves de las facilidades del Dominio, salir del mismo y, finalmente, devolverle a este sus pertenencias. Ese protocolo fue el mismo que se siguió cuando se despidió al demandante.

[…]

30. El Ethics and Compliance Procedure requiere que los gerentes como el demandante fomentaran un ambiente en el cual los empleados se sintieran cómodos, libres de expresar cualquier preocupación y levantar cualquier asunto sin temor a represalias. Igual norma dispone el Code of Business Ethics and Conduct que tenía implementado Battelle.

[...]

32. En particular, la versión vigente del Code of Business Ethics and Conduct durante la relación de empleo del demandante con Battelle disponía, en lo aquí pertinente, lo siguiente:

> Managers are expected to foster an environment in which their employees feel free to express concerns and to raise issues without fear of retaliation. Retaliation for the good faith reporting of a concern regarding any suspected instances of improper conduct, violation of law, regulation, or policy, or for participation in an investigation, is unacceptable and will not be tolerated by Battelle. Any suspicion of such behavior must be promptly reported to one of the Business Ethics Hotlines or Battelle Legal Counsel.

33. Similarmente, la versión vigente del Ethics and Compliance Procedure durante la relación de empleo del demandante con Battelle dispone, en lo aquí pertinente, lo siguiente:

> Managers are expected to foster an environment in which their employees feel free to express concerns and to raise issues without fear of retaliation. Retaliation for the good faith reporting of a concern regarding any improper conduct, violation of law or policy, or for participation in an investigation, is unacceptable and will not be tolerated by Battelle. Suspected instances of such behavior must be promptly reported to one of Battelle's confidential Business Ethics Hotlines or Battelle Legal Counsel.

[...]

36. Battelle también tenía como política durante la relación de empleo del demandante con la empresa que si un empleado detectaba una potencial conducta impropia o de violación de ley o de violación a alguna política de la empresa, o si tenía alguna preocupación al respecto, debía prontamente reportarla a través del "hotline" de Battelle, incentivándose que esta línea caliente se utilizara.

37. De otra parte, durante la relación de empleo con el demandante, Battelle tenía vigente una política sobre estándares de conducta y disciplina titulada Standards of Conduct and Discipline Policy.

38. El Standards of Conduct and Discipline Policy incluía una lista no taxativa de conductas no aceptadas que podían conllevar acción disciplinaria, incluido el despido. Entre esas conductas no aceptadas que podían incluir el despido como medida disciplinaria se encontraban fallar en observar las reglas de seguridad, incumplimiento con las normas de la Compañía, incurrir en conducta de, o fomentar un ambiente de

trabajo de, intimidación u hostigamiento, entre otros. Al no ser taxativa, existían otras razones que podían conllevar disciplina o el despido a discreción de Battelle, siendo esto de conocimiento del demandante.

39. Durante la relación de empleo del demandante con Battelle, esta tenía vigente una política sobre delegaciones de autoridad titulada Delegation of Authority.

[…]

52. El 5 de marzo de 2021, Rivera presentó mediante el sistema Navex, Portal Interno de Ética de Battelle, una queja interna contra el demandante sobre preocupaciones de seguridad y problemas de salud ocupacional y violaciones de las leyes o regulaciones relacionadas con la seguridad que ocurrían en el Dominio de Guánica, que, según él, había reportado previamente al demandante sin que este último tomara acción sobre ellas.

53. En su queja interna Rivera reportó la inacción del demandante en torno a señalamientos que él le hizo previamente a este sobre posibles violaciones a las regulaciones de la Occupational Safety and Health Administration Act ("OSHA", por sus siglas en inglés).
54. Previo a que Rivera presentara su queja interna contra el demandante el 5 de marzo de 2021, Rivera había informado a Wilmarie Plaza ("Plaza"), Safety Officer del Dominio de Guánica, sobre los "safety concerns" con relación a las mencionadas posibles violaciones a las regulaciones de OSHA.

55. En apoyo a su queja Rivera incluyó una serie de correos electrónicos que intercambió con el demandante mediante los cuales sostuvo que Toro incumplió con el Code of Business Ethics and Conduct de Battelle.

56. Cabe señalar que luego de que Rivera presentó su queja interna, el 22 de marzo de 2021, el demandante cursó un correo electrónico a Amanda Price, con copia a Ruiz --Supervisora de Toro--, en el cual informó sobre una queja interna que ese mismo día le trajo a él su supervisada Velázquez en una reunión individual ("one on one") que Toro sostuvo con esta. En el correo electrónico el demandante vertió la información que Velázquez le compartió sobre conductas de alegado hostigamiento sexual hacia ella por parte de Rivera.

57. El demandante, pues, lo que hizo fue escalar a Price y a Ruiz la queja interna que trajo a él su entonces supervisada Velázquez, días luego de que Rivera se quejara internamente de Toro.

58. La queja interna de Rivera, así como la queja presentada por Velázquez contra Rivera y que Toro escaló fueron investigadas por Battelle a la misma vez.

59. Ambas quejas internas fueron investigadas por Amanda Price ("Price"), Senior Human Resources

Business Partner, y Laureen Lunsford ("Lunsford"), Human Resources Representative de Battelle.

60. Durante el curso de la investigación al unísono de ambas quejas el demandante fue entrevistado por Price y Lunsford de manera virtual a través de la plataforma Teams. Toro fue entrevistado, pues, en relación con ambas quejas.

61. Durante la investigación surgió que los "safety concerns" de posibles violaciones a las regulaciones de OSHA de los que se quejó Rivera contra el demandante se dieron en el contexto del procedimiento denominado "sensor swapping".

62. El procedimiento de sensor swapping consistía en cambiar determinados sensores en, entre otras, el subsistema de instrumentación del Dominio de Guánica. El procedimiento concluía con el recogido apropiado de las áreas donde se ubicaba el equipo para evitar accidentes en la oficina del Dominio. Ese procedimiento se ejecutaba cuatro veces al año. Por eso, los eventos de sensor swapping se calendarizaban y plantificaban con anticipación.

63. De la investigación interna surgió, además, que desde el año 2017 múltiples empleados le habían reportado al demandante preocupaciones sobre seguridad ("safety") y de falta de espacio para transitar con seguridad en la oficina del Dominio de Guánica durante las actividades de sensor swapping. Ello, debido a la forma y lugar en que se colocaba el equipo recibido para realizar tales actividades en el Dominio dirigido por el demandante.

64. El demandante reconoce que el 17 de febrero de 2021 Plaza le reportó preocupaciones sobre la ubicación del equipo recibido en el Dominio para las actividades de sensor swapping.

65. Plaza tomó fotografías sobre sus preocupaciones en torno a la ubicación del mencionado equipo debajo de los extintores de fuego en la oficina del Dominio y de cajas de sensores que bloqueaban y obstruían el paso en esa oficina.

66. Posteriormente, Ingrid González ("González"), Chemical Hygiene Officer, se comunicó con Skip Soward ("Soward"), Boulder Industrial Hygiene Officer de Battelle a nivel corporativo en los Estados Unidos, sobre tales preocupaciones de seguridad relacionadas a la ubicación del mencionado equipo en la oficina del Dominio que generaba potenciales violaciones a normas de seguridad. González también expresó entonces sus preocupaciones de seguridad al demandante.

67. De igual manera surgió de la investigación que Rivera, previo a instar su queja interna en contra de Toro, se comunicó con este en varias ocasiones para reportarle las preocupaciones que él tenía sobre seguridad y posibles violaciones a OSHA.

68. Adicionalmente, surgió de la investigación interna que, ante la inacción del demandante, Rivera reportó las preocupaciones sobre seguridad y posibles violaciones a la OSHA a Soward, así como a Matt Schroeder ("Schroeder"), Assistant Director of Field Operations.

69. Schroeder compartió con el demandante el correo electrónico que le envió Rivera. Esto, reenviándoselo a Toro.

70. Sin embargo, surgió de la investigación interna que, en lugar del demandante tomar acción en dirección a buscar una solución a las preocupaciones sobre seguridad y posibles violaciones a las regulaciones de la OSHA traídas a su atención por distintas personas, incluyendo Rivera, Toro procedió a: (1) dirigirse a Rivera para cuestionarle que debía seguir la cadena de comando ("chain of command") e ir primero donde él antes de escalar a nivel corporativo una queja relacionada al Dominio y (2) solicitarle a Rivera que le mostrara sus certificaciones de OSHA a la brevedad posible cuando a Rivera no le era requerido tener certificaciones de OSHA para desempeñar sus funciones.

71. Más allá, la investigación interna concluyó que enterado de la queja de Rivera contra él, el demandante le indicó expresamente a Rivera que parte de sus responsabilidades incluían la organización de las áreas en la oficina del Dominio, y que le avisara si era que él no podía cumplir con esas responsabilidades.

72. A tono con lo anterior, los demás empleados entrevistados durante la investigación interna reportaron que el demandante mantenía en ellos: (1) una expectativa de adherencia a la cadena de comando en lo que a él respecta e (2) intimidación que, de no seguir la cadena de comando informando a él primero, temían ser víctimas de represalias por parte de él.

73. Surgió de la investigación interna que, en lugar del demandante atender las preocupaciones reportadas por Plaza sobre seguridad y carencia de espacio en la oficina del Dominio mencionadas, este le pidió a ella que publicara en la plataforma de WhatsApp en el chat de empleados las fotografías que ella tomó sobre las preocupaciones de seguridad que ella le reportó a él.

74. El demandante reconoce que en el Dominio que él dirigía las preocupaciones sobre seguridad, falta de espacio y potenciales violaciones a las regulaciones de OSHA existían y, además, reconoce que la ubicación de equipos en la oficina del Dominio que él dirigía podía causar un problema de seguridad.

75. El demandante responsabilizó a Rivera por no recibir o coordinar el recibo del equipo mal ubicado en la oficina del Dominio que causó las preocupaciones de seguridad y potenciales violaciones a las regulaciones de OSHA reportadas.

76. El demandante adujo que Rivera "is not performing at the level he should" respecto a la organización y ubicación del equipo relevante a las actividades de sensor swapping; sin embargo, nunca disciplinó a su supervisado Rivera ni le señaló a este, tal deficiencia en desempeño por medio de Ruiz y/o Ritz para que estos últimos investigaran y, de ser lo procedente, lo disciplinaran.

77. A pesar de que el demandante adujo que Rivera tenía la responsabilidad de coordinar actividades asociadas con el sensor swapping, tanto Rivera como otros empleados reportaron a Toro, como Gerente del Dominio, los problemas de espacio para transitar en la oficina del Dominio y poder cumplirse, de manera segura y eficiente, con esa responsabilidad.

78. El demandante era la persona responsable de canalizar, atender y facilitar o resolver los asuntos relacionados a proveer a los empleados a su cargo en las oficinas del Dominio un espacio seguro dentro del cual Rivera y el restante personal se desempeñaban.

79. A base de la información que surgió de la investigación interna se concluyó que el demandante abdicó su responsabilidad y falló al no resolver las preocupaciones sobre seguridad que varios empleados, incluido Rivera, le compartieron.

80. Más allá, la investigación interna concluyó que Toro solamente prestó atención a las quejas por falta de espació cuando Rivera se quejó internamente a nivel corporativo con Soward y Schroeder. Toro no había actuado sobre ellas anteriormente.

81. La investigación interna concluyó que, en la medida en que lejos de proveer a Rivera y al resto del personal del Dominio a su cargo una solución a las preocupaciones de seguridad y de potenciales violaciones a las regulaciones de OSHA que varios empleados trajeron a la atención de Toro, incluyendo por vía de la queja interna de Rivera, el demandante reaccionó a tal queja: (1) cuestionándole a Rivera su cumplimiento con la cadena de comando, (2) advirtiéndole a Rivera que, antes de escalar a nivel corporativo un asunto atinente al Dominio que él dirigía, debía informárselo a él, (3) requiriéndole a Rivera sus certificaciones de OSHA cuando estas no le eran requeridas para desempeñar su puesto, y (4) que le avisara si era que no podía cumplir con sus responsabilidades de organización de equipos en la oficina del Dominio.

82. El demandante actuó en contravención con las Políticas y Códigos de Battelle que fomentan que los empleados traigan a la atención de la empresa cualesquiera preocupaciones que tuviesen referentes a su empleo y que prohíben terminantemente crear un ambiente de trabajo de miedo/intimidación y temor a represalias.

83. El demandante sabía que no podía haber nada ubicado debajo de los extintores de fuegos en la oficina del Dominio por motivos de seguridad.

84. El demandante sabía que no podía haber nada en los pasillos de la oficina del Dominio que obstruyera el paso por motivos de seguridad.

85. El Demandante reconoce que él era el último responsable de todo lo que acontecía en el Dominio de Guánica al ser este su Gerente de Operaciones de Campo.

86. Específicamente, Toro reconoce que él era el último responsable de atender y resolver las preocupaciones aquí relevantes de seguridad, falta de espacio para transitar en la oficina del Dominio y de potenciales violaciones a las regulaciones de OSHA.

87. Battelle concluyó que la inacción del demandante en torno su responsabilidad de canalizar, atender y facilitar o resolver las preocupaciones relacionadas a la seguridad y carencia de espacio en la oficina del Dominio colocaron a Battelle en riesgo de penalidades severas bajo las regulaciones de OSHA, toda vez que surgió de la investigación interna que, previo a Rivera, varios otros empleados reportaron repetidas preocupaciones sobre seguridad en el Dominio dirigido por Toro.

88. El demandante conocía que la investigación interna sobre posibles violaciones a las regulaciones de OSHA ocurrió luego que Rivera trajera a la atención de la empresa su queja interna sobre "safety concerns" y potenciales violaciones a OSHA.

89. De la investigación de la queja interna sobre preocupaciones de seguridad y posibles violaciones a OSHA surgió, además, que múltiples empleados reportaron previamente otras potenciales violaciones de seguridad acaecidas en el Dominio, incluidas violaciones a las normas de COVID-19, pero el demandante tampoco las atendió.

90. De la investigación de la queja interna sobre preocupaciones de seguridad y posibles violaciones a OSHA surgió que el demandante conocía sobre otros comentarios inapropiados de índole sexual que ocurrieron en su Dominio mientras este lo dirigía, pero no fue hasta que Velázquez le compartió su preocupación de hostigamiento sexual que entonces Toro escaló la situación informada a él por ella en la reunión individual ("one on one") ambos sostuvieron luego de que Rivera hubiese presentado su queja interna en contra de Toro.

91. Surgió de la investigación que empleados del Dominio que dirigía el demandante también reportaron a este, preocupaciones de seguridad en torno a la salud de los Temporary Field Technicians por entrenamiento inadecuado ya que podían perderse en el bosque seco de Guánica y el calor podía causarles desorientación.

La situación llegó al punto de que personal temporero en el bosque se llegó a extraviar.

92. Surgió de la investigación interna, además, que debido a la inacción del demandante en cuanto a la preocupación reportada por entrenamiento inadecuado una empleada temporera del Dominio sufrió quemaduras severas tras haber estado expuesta a sol directo por cinco (5) horas sin el equipo adecuado.

93. Durante la relación de empleo con Battelle el demandante recibió acción disciplinaria por incumplimiento con otras políticas de Battelle.

94. El demandante recibió una advertencia escrita el 13 de junio de 2019 sobre incumplimientos con las políticas de delegación de autoridad y de registro de horas trabajadas de Battelle que fue entregada al demandante por su supervisora Ruiz y discutida con él. [...]

96. El demandante cesó sus labores en Battelle el 10 de mayo de 2021 tras Battelle cursarle, por conducto de Ruiz, una carta de separación de empleo.

97. Amanda Price, como Sr. Human Resources Business Partner, notificó a Ruiz los hallazgos y conclusiones de la investigación que ésta condujo junto a Lunsford. Luego de ello, Amanda Price apoyó la decisión de Ruiz de despedir a Toro de conformidad con el Código de Estándares de Conducta y Disciplina de Battelle y la Política de Represalias/Código de Ética de Negocios y Conducta de la Compañía.

[...][7]

Basado en lo antes y en su análisis del derecho aplicable, el TPI resolvió que no concurrieron los elementos requeridos para establecer las causas de acción invocadas. En su consecuencia, desestimó la totalidad del pleito según presentado. Oportunamente, el Sr. Toro solicitó reconsideración, la cual fue denegada por el TPI mediante *Resolución* emitida el 29 de mayo de 2024.

Aún insatisfecho, el Sr. Toro acude ante esta Curia y nos señala la comisión de los siguientes errores, a saber:

1. Erró el Honorable Tribunal al dirimir cuestiones de credibilidad en el *ratio decidendi* de la solicitud de sentencia sumaria de la querellada-apelada.
2. Erró el Honorable Tribunal al resolver la solicitud de sentencia sumaria de la querellada-apelada basándose en prueba de referencia.
3. Erró el Honorable Tribunal al no atender las alegaciones de expoliación levantadas por la querellante-apelante.

---

[7] Apéndice pág. 2298-2323.

4. Erró el Honorable Tribunal al concluir que en la medida en que la separación del empleo del querellante-apelante ocurrió luego de la aprobación de la Ley 4, no puede valerse de ninguna presunción de despido injustificado y, además, carga con el peso de la prueba bajo la Ley 80.

En cumplimiento con nuestra *Resolución* emitida el 3 de julio de 2024, BMI comparece mediante *Alegato de la parte apelada* por lo que, con el beneficio de las posturas de ambas partes, resolvemos.

**II**

**A. Sentencia Sumaria**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario, y el derecho así lo permita. *Cruz Cruz y otra v. Casa Bella Corp. y otros,* 2024 TSPR 47, resuelto el 8 de mayo de 2024; *SLG Fernández-Bernal v. RAD-MAN San Juan et al,* 208 DPR 310 (2021). Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Íd.,* págs. 42-43. Asimismo, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Segarra Rivera v. Int'L. Shipping et al.,* supra.

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. *Oriental Bank v. Caballero García,* 212 DPR 671 (2023). Véase, además, la Regla 36.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. Si el promovente de la moción incumple con estos requisitos, "el Tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Por otro lado, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra*, pág. 43. Por el contrario, quien se opone a que se declare con lugar esta solicitud viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Ante ello, en la oposición a una solicitud de sentencia sumaria, el promovido debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden

que se dicte sentencia sumaria en su contra. *Íd.*, pág. 44. Claro está, para cada uno de estos supuestos deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil; *Birriel Colón v. Supermercado Los Colobos (Econo Rial, Inc.) e Integrand Assurance Company*, 2023 TSPR 120, resuelto el 3 de octubre de 2023.

En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal. *Meléndez González et al. v. M. Cuebas*, supra.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por el promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues sólo procede si bajo ningún supuesto de hechos prevalece el promovido. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia y ser consciente en todo momento que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra, pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Cruz Cruz y otra v. Casa Bella Corp. y otros,* supra. Además, existen casos que no se deben resolver mediante sentencia

sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.*

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: 1) examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; 2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de formas codificados en la referida Regla 36, *supra*; 3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos; 4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, "nos encontramos en la misma posición que el Tribunal de Primera Instancia para evaluar la procedencia de una sentencia sumaria". *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). Por ello, nuestra revisión es una *de novo* y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, y su jurisprudencia interpretativa. *Íd.* De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *Íd.*

Añadir el caso que establece el TSPR sobre la moción de dispositiva de sentencia sumaria y su aplicación en los casos laborales.

**B. Ley Núm. 80 de 30 de mayo de 1976, según enmendada**

La Ley Núm. 80 de 30 de mayo de 1976, conocida como la Ley de Indemnización por Despido sin Justa Causa,[8] 29 LPRA sec. 185a *et seq.*, según enmendada, (Ley Núm. 80), regula las acciones relacionadas con el despido de un empleado. Tiene el propósito de proteger al empleado de actuaciones arbitrarias del patrono e imponer remedios económicos que desalienten la práctica de despedir a los empleados injustificadamente. *Ortiz Ortiz v. Medtronic Puerto Rico*, supra; *Romero et als. v. Cabrera Roig et als.*, 191 DPR 643, 649-650 (2014). *SLG Torres-Matundan v. Centro Patología*, 193 DPR 920, 929 (2015). *González Santiago v. Baxter Health Care*, supra.

El referido estatuto establece que "aquellos empleados de comercio, industria o cualquier otro negocio o sitio de empleo que: (1) están contratados sin tiempo determinado; (2) reciben una remuneración, y (3) son despedidos de su cargo, sin que haya mediado una justa causa", tienen derecho al pago de una compensación por su patrono denominada como la mesada. *Orsini García v. Srio. de Hacienda*, 177 DPR 596, 620-621 (2009); *Rodríguez Gómez v. Multinational Ins.,* 207 DPR 540 (2021); *Indulac v. Unión,* 207 DPR 279 (2021).

Sin embargo, cabe destacar que el Tribunal Supremo ha establecido que "[e]n Puerto Rico no existe una prohibición absoluta contra el despido de un empleado. Si existe justa causa, éste puede ser despedido". *Santiago v. Kodak Caribbean, Ltd.,* 129 DPR 763, 775 (1992); *Feliciano Martes v. Sheraton,* 182 DPR 368, 380 (2011); *Ortiz Ortiz v. Medtronic Puerto Rico,* supra. De no existir justa causa, el remedio provisto es la imposición al patrono del pago de la mesada

---

[8] Adelantamos que la Ley Núm. 80 fue enmendada por la Ley Núm. 4 de 2017, conocida como Ley de Transformación y Flexibilidad Laboral, aprobada el 26 de enero de 2017.

a favor del empleado por el tiempo trabajado para el patrono. *Rodríguez Gómez v. Multinational Ins.,* supra, págs. 549-550.

Asimismo, la propia Ley Núm. 80, *supra,* estatuye claramente las ocasiones en las que un patrono tendrá justa causa para desvincular a un empleado del puesto. De este modo, en su Artículo 2 reconoce que:

Art. 2. - Justa causa para el despido.

Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:

(a) Que el empleado incurra en un patrón de conducta impropia o desordenada.

(b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

[…]

29 LPRA sec. 185b.

Sin embargo, esas tres instancias, al igual que las demás que se enumeran en la Ley Núm. 80, *supra,* son solo ejemplos de las posibles causas que constituyen justa causa para el despido. Lo antes obedece a que, la enumeración de escenarios que se consideran justa causa contenida en la Ley Núm. 80, *supra,* no es taxativa. *SLG Torres-Matundan v. Centro Patología,* supra; Véase *Indulac v. Unión,* supra, pág. 299. Las circunstancias constitutivas de justa causa, esbozadas en el Art. 2 de la Ley Núm. 80, *supra,* constituyen meros ejemplos de instancias asociadas a un despido. *Íd.*

Por esa razón, los patronos están en libertad de adoptar los reglamentos y las normas razonables que estimen necesarias para el buen funcionamiento de la empresa y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. *González Santiago v. Baxter Health Care*, supra, pág. 292; *Jusino et als. v. Walgreens*, 155 DPR 560 (2001); *Ortiz Ortiz v. Medtronic Puerto Rico*, supra. Según nuestro Máximo Foro, en las situaciones en las que un patrono despide a un empleado por una causal que no se encuentre enumerada en la Ley Núm. 80, *supra*, el análisis para determinar si esta constituye justa causa se apoya en el principio rector de la Ley Núm. 80, *supra*, contenido en el segundo párrafo de su Art. 2, *supra*, el cual establece lo siguiente: "No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento". *SLG Torres-Matundan v. Centro Patología*, supra, pág. 931; *González Santiago v. Baxter Health Care*, supra, pág. 292.

Con ello en mente procede señalar que el Tribunal Supremo ha establecido que a pesar de que la Ley Núm. 80, *supra*, "no favorece el despido como sanción a la primera falta, ello podría considerarse justificado si dicha acción u omisión, por su gravedad y potencial de agravio, pone en riesgo la seguridad, el orden o la eficiencia que constituyen el funcionamiento del negocio". *Rivera v. Pan Pepín*, 161 DPR 681, 690 (2004); *Indulac v. Unión*, supra; *González Santiago v. Baxter Health Care*, supra, págs. 292-293.

En esos casos particulares, la falta o acto aislado que dé lugar al despido del empleado en primera ofensa ha de ser de tal seriedad o naturaleza que revele una actitud o un detalle de su carácter, tan lesivo a la paz y al buen orden de la empresa, que constituiría una imprudencia esperar a que se repita, para entonces proceder con el despido. *Indulac v. Unión*, supra, pág. 300.

De otra parte, antes de la aprobación de la Ley Núm. 4-2017, mejor conocida como Ley de Transformación y Flexibilidad Laboral, el Art 8 de la Ley 80, *supra*, 29 LPRA sec. 185k(a), disponía que "el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado".

Respecto a esa disposición, el Tribunal Supremo expresó en *Feliciano Martes v. Sheraton*, 182 DPR 368, 385-386 (2011), que lo anterior invertía el orden de la prueba en casos civiles y le imponía al patrono el deber de que el despido fue justificado. Posteriormente, en *Romero et als. v. Cabrer Roig et als*, 191 DPR 643, 652 (2014) dispuso lo siguiente:

> "Finalmente, para adelantar el propósito de su naturaleza reparadora, la Ley Núm. 80, *supra*, invierte el orden de la prueba en casos civiles y le impone al patrono el deber de probar *in limine* que el despido fue justificado. Si así lo prueba, el patrono no estará obligado a pagar la mesada. Véase *Secretario del Trabajo v. I.T.T.*, 108 DPR 536 (1979). Además, la Ley Núm. 80, *supra*, dispone que, en toda acción instada al amparo de esta, el patrono estará obligado a alegar en la contestación a la demanda, los hechos que dieron origen al despido y probar que estuvo justificado para quedar eximido del pago de la indemnización que dispone esa ley. 29 LPRA sec. 185k(a). En otras palabras, la Ley Núm. 80, *supra*, establece una excepción a la norma general de derecho que dispone que en toda reclamación judicial instada por una parte contra un demandando, sea el reclamante quien tiene la obligación de probar sus alegaciones para prevalecer en un pleito. (Citas omitidas)

Sin embargo, el Art. 4.9 de la Ley de Transformación y Flexibilidad Laboral enmendó el Art. 8 de la Ley 80, *supra*, para eliminar el origen de la presunción. Cónsono con esto, el Tribunal Supremo en *Ortiz Ortiz v. Medtronic*, supra, aclaró sobre quien recae el peso de la prueba. En lo pertinente, dispuso lo siguiente:

> "Ahora bien, "**para disfrutar de la presunción generada por la Ley [Núm.] 80 hace falta, como elemento de umbral, que haya habido un despido**". (Negrilla suplida). *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 907. Por tal razón, "[el] demandante tiene la obligación de aportar prueba que establezca los hechos básicos que den lugar a la presunción". Id., pág. 911.

Una vez activada la presunción estatutaria a favor del empleado, el patrono tiene el deber de presentar prueba para rebatir la presunción y, además, persuadir al juzgador mediante preponderancia de la evidencia. *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 911". En tal sentido, "los temas de carga de prueba y presunciones son inseparables". *Íd.* pág. 913.

No obstante, el Tribunal Supremo aclaró la manera en que aplicaría la presunción de la Ley Núm. 80 *supra*. Particularmente, resolvieron que, "**[l]a disposición aplicable es la que se encontraba vigente al momento de los hechos que dieron lugar a la causa de acción por despido injustificado.**" (Énfasis nuestro). *Ortiz Ortiz v. Medtronic*, supra, pág. 781. En otras palabras, para determinar sí aplica la presunción de la Ley 80, *supra*, o la presunción de la Ley 4, *supra*, debemos analizar cuando surgen los hechos que provocaron el despido del empleado.

### D. Ley Núm. 115-1991, según enmendada

El Art. 2 de la Ley 115-1991, según enmendada, conocida como la *Ley de Represalias contra el Empleado por Ofrecer Testimonio*, establece que:

(a) Ningún patrono podrá despedir, amenazar o discriminar contra un "empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

(b) Cualquier persona que alegue una violación a esta Ley podrá instar una acción civil en contra del patrono dentro de tres (3) años de la fecha en que ocurrió dicha violación y solicitar se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado. La responsabilidad del patrono con relación a los daños y a los salarios dejados de devengar será el doble de la cuantía que se determine causó la violación a las disposiciones de esta Ley.

(c) El empleado deberá probar la violación mediante evidencia directa o circunstancial. El empleado podrá

además establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por esta Ley y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido.

29 LPRA sec. 194(b).

A través de esta legislación se le brinda protección a empleados frente a represalias que pueda tomar un patrono contra éstos por proveer testimonio, expresión o información, ya sea verbal o escrita, ante un foro judicial, legislativo o administrativo. *S.L.G. Rivera Carrasquillo v. A.A.A.,* 177 DPR 345, 361 (2009). Citando a *Ocasio v. Kelly Servs.,* 163 DPR 653 (2005).

Un empleado tiene dos (2) maneras de establecer un caso de represalias, esto es: (a) probar la violación mediante evidencia directa o circunstancial que demuestre un nexo causal entre la conducta del patrono demandado y el daño sufrido; o (b) establecer la presunción *juris tantum* de la Ley Núm. 115-1991, *supra. S.L.G. Rivera Carrasquillo v. A.A.A., supra,* pág. 362. Véanse también, 29 LPRA sec. 194b(a), en su inciso (c); *Rivera Menéndez v. Action Service,* 185 DPR 431 (2012). Así, una vez el obrero presenta un caso *prima facie,* se crea una presunción de que el despido fue en concepto de represalia. *S.L.G. Rivera Carrasquillo v. A.A.A.,* supra, pág. 361. Un empleado establece un caso *prima facie* por preponderancia de la prueba estableciendo que: (1) participó en una actividad o conducta protegida por ley; y que (2) subsiguientemente haya sido despedido, amenazado o discriminado en su empleo. *Id.,* pág. 362. Establecido lo anterior, le corresponde al patrono rebatir la presunción fundamentando el despido legítimamente. *Id.*

### E. Reglas de Evidencia

Conforme surge de la normativa relacionada a la Regla 36 de las Reglas de Procedimiento Civil *supra,* nuestro ordenamiento civil

y su jurisprudencia interpretativa impone que el petitorio sumario deberá sostenerse con prueba admisible en evidencia con el propósito de establecer hechos esenciales y pertinentes a la causa de acción instada.

A esos efectos es preciso señalar que, las Reglas de Evidencia rigen la forma y el proceso mediante el cual se admite la prueba ante los tribunales. En cuanto a ello, la Regla 901 de Evidencia establece que este requisito "se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene". 32 LPRA Ap. VI, R. 901. La autenticación de evidencia "es sencillamente, establecer que la evidencia es lo que el proponente alega que es". E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas*, 1ra ed., San Juan, Ed. Situm, 2016, pág. 345.

De otra parte, la Regla 801 de Evidencia define la prueba de referencia como "una declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". 32 LPRA Ap. VI, R. 801. Como regla general, la prueba de referencia no es admisible, salvo las excepciones contempladas por ley. Regla 804 de Evidencia, 32 LPRA Ap. VI, R. 804. El Tribunal Supremo de Puerto Rico ha expresado que la objeción a la prueba de referencia invoca "falta de conocimiento personal del testigo sobre la materia o asunto en controversia" y la incapacidad para confrontar al tercero que hizo la declaración. *Pueblo v. Guerrido López*, 179 DPR 950, 954 (2010).

Así pues, la exclusión de la prueba de referencia, según definida en la Regla 801 de Evidencia, *supra*, obedece a que por su naturaleza no están presentes las condiciones ideales --juramento o afirmación, presencia o inmediatez y la confrontación--, que exige el derecho de la prueba para apreciar, evaluar y adjudicar la

credibilidad de testigos. E. Vélez Rodríguez, *La Prueba de Referencia y sus Excepciones*, Interjuris 2010, págs. 8 y ss.

Las Reglas 805 a la 809 de Evidencia, 32 LPRA Ap. VI, R. 805-809, establecen las excepciones a la exclusión de prueba de referencia. En lo que atañe el caso ante nos, debemos examinar el inciso (f) de la Regla 805 de Evidencia, *supra*. Bajo dicho inciso, aun cuando la persona declarante esté disponible como testigo, una declaración no estará sujeta a la regla general de exclusión de prueba de referencia en las siguientes circunstancias:

[...]

(F) *Récords de actividades que se realizan con regularidad*: Un escrito, informe, récord, memorando o compilación de datos -en cualquier forma- relativo a actos, sucesos, condiciones, opiniones o diagnósticos que se hayan preparado en o cerca del momento en que éstos surgieron, por una persona que tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta, si dichos récords se efectuaron en el curso de una actividad de negocios realizada con regularidad, y si la preparación de dicho escrito, informe, récord, memorando o compilación de datos se hizo en el curso regular de dicha actividad de negocio, según lo demuestre el testimonio de su custodio o de alguna otra persona testigo cualificada, o según se demuestre mediante una certificación que cumpla con las disposiciones de la Regla 902(k) o con algún estatuto que permita dicha certificación, a menos que la fuente de información, el método o las circunstancias de su preparación inspiren falta de confiabilidad. El término "negocio", según se utiliza en este inciso, incluye, además de negocio propiamente, una actividad gubernamental y todo tipo de institución, asociación, profesión, ocupación y vocación, con o sin fines de lucro.

[...]

32 LPRA Ap. VI, R. 805 (f).

Por su parte, la Regla 805 (f) de Evidencia, *supra*, establece una serie de criterios medulares que se evalúan para permitir la presentación de un récord de negocios: (i) que se haya preparado la prueba en o cerca del momento en que ocurrieron los sucesos o las actividades mencionadas por una persona que tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta, (ii) que se haya llevado a cabo en el curso de la actividad realizada con

regularidad, y; (iii), que se haya preparado como una práctica regular de dicha actividad. E. L. Chiesa Aponte, *op. cit.,* págs. 302-303.

Es menester destacar, que "Bajo esta nueva Regla ya no es indispensable para su admisibilidad el testimonio del custodio de récords u otro testigo, si se utiliza una certificación que cumpla con las disposiciones de la Regla 902 (K) o con algún estatuto que permita dicha certificación". R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed., San Juan, Ediciones Situm, Inc., 2015, pág. 509-510.

Como corolario de lo anterior, en cuanto a la autenticación *prima facie*, la Regla 902 (K) dispone lo siguiente:

> (K) Récords certificados de actividades que se realizan con regularidad El original o un duplicado de un récord de actividades que se realizan con regularidad dentro de la jurisdicción del Estado Libre Asociado de Puerto Rico y los Estados Unidos de América, el cual sería admisible conforme a la Regla 805(F), si se acompaña de una declaración jurada de la persona a cargo de su custodia o de alguna otra persona cualificada, que certifique que dicho récord:
>
> (1) se preparó en o cerca del momento en que ocurrieron los sucesos o las actividades mencionadas por una persona que tiene conocimiento de dichos asuntos, o mediante información transmitida por ésta;
>
> (2) se llevó a cabo en el curso de la actividad realizada con regularidad, y
> (3) se preparó como una práctica regular de dicha actividad.
>
> [...]

A su vez, los criterios a tomar en cuenta en el análisis de la confiabilidad del récord figuran los siguientes: (1) si la información recopilada es importante para el negocio en cuestión fuera del contexto litigioso en el que se ofrece; (2) si el récord contiene información fáctica relativamente simple y no evaluaciones o conclusiones; (3) si la persona que transmite la información y la persona que practica el asiento (que pueden ser personas distintas) son independientes de las partes en el pleito; (4) si la información

está corroborada por evidencia independiente; (5) si el registro se prepara por una persona con experiencia, y si se verificó la exactitud del mismo. V. Neptune, *Derecho Probatorio*, 80 Rev. Jur. UPR 725, 729 (2011). Citando, *H.R. Stationary, Inc. v. E.L.A.*, 119 DPR 129, 142 (1987).

### F. Descubrimiento de prueba

Como se sabe, el descubrimiento de prueba "[e]s el mecanismo utilizado por las partes para "obtener hechos, título, documentos u otras cosas que están en poder del demandado o que son de su exclusivo conocimiento y que son necesarias […] para hacer valer sus derechos". *Mcneil Healthcare v. Mun. Las Piedras II*, 206 DPR 659, 672 (2021). La Regla 23 de Procedimiento Civil, 32 LPRA Ap. V, R. 23, provee los parámetros concretos que regulan el descubrimiento de prueba en los casos civiles. *Torres González v. Zaragoza Meléndez*, 211 DPR 821 (2023).

En particular**,** la Regla 23.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, R. 23.1, en lo aquí pertinente, dispone que:

> (d) Obligación de preservar prueba sujeta al descubrimiento. Una persona apercibida de una posible reclamación en su contra tiene la obligación de preservar prueba. También tiene dicha obligación si existe un deber legal o ético que le exija preservar prueba, si voluntariamente asumió la obligación o si surge de las circunstancias particulares del caso. Asimismo, una parte tiene la obligación de preservar prueba que podría estar sujeta al descubrimiento, aunque ésta no se le haya requerido. La obligación de preservar información almacenada electrónicamente estará sujeta a lo dispuesto en la Regla 34.3.

Por su parte, la Regla 34.3 (d) de Procedimiento Civil, 32 LPRA Ap. V, dispone:

> Si la **parte promovente** del descubrimiento de prueba pertinente a las alegaciones o defensas **justifica con prueba fehaciente que la parte promovida se niega a descubrir lo solicitado por haber destruido o incumplido con su deber de preservar prueba pendiente de litigio o razonablemente utilizable en un pleito futuro**, estará sujeta a las sanciones dispuestas en estas reglas. El tribunal no podrá ordenar la imposición de sanciones bajo esta regla a una parte por no proveer información almacenada electrónicamente, que demuestre que se ha

perdido como resultado de la operación rutinaria de buena fe del sistema de almacenamiento electrónico de información, salvo que antes de efectuar dicha operación se le haya requerido a la parte preservar la prueba. [...]

Procede señalar que la expoliación de prueba ha sido reconocida como una conducta torticera. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776 (1999). La doctrina de la expoliación de evidencia se ha descrito como el acto de obstruir o perjudicar la búsqueda de la verdad e incluye, entre otros, declarar falsamente, fabricar o esconder evidencia y destruir o alterar evidencia pertinente. Véase, V. Neptune Rivera, *Los retos de la evidencia electrónica*, 76 Rev. Jur. UPR 337, 341-342 (2007). El propósito de la aplicación de esta doctrina es impedir que la parte que ha ocasionado la pérdida o destrucción de la evidencia se beneficie de sus actos. *Íd.*, a la pág. 342. La aplicación de la doctrina de expoliación de evidencia requiere lo siguiente: (1) la evidencia existe; (2) está en posesión y bajo el control de la otra parte; (3) sería admisible en el tribunal; y (4) la parte la destruyó intencionalmente. *Íd.*, a la pág. 343. Asimismo, se debe demostrar que la parte que tenía control de la evidencia obró de mala fe al destruirla o alterarla significativamente. *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31 (1st Cir. 2017).

**III.**

Nos corresponde determinar si el foro primario incidió al desestimar la totalidad de la demanda por la vía sumaria. Como anteriormente expresamos, en virtud de la normativa antes expuesta, esta Curia debe revisar *de novo* la *Moción Solicitando Sentencia Sumaria* presentada por BMI y la *Oposición a Solicitud de Sentencia Sumaria Parcial* presentada por el Sr. Toro. A su vez, debemos examinar los referidos escritos con sus respectivos anejos, a la luz del derecho aplicable, para así justipreciar la corrección de la determinación del foro primario. A esos efectos, procede evaluar

si ambas partes cumplieron los requisitos de forma que exige la Regla 36, *supra.*

Luego de examinar cuidadosamente la moción de sentencia sumaria, según presentada ante el foro primario, concluimos que BMI, sí dio cumplimiento a los requisitos de forma establecidos por nuestras reglas. La apelada incluyó una relación concisa y enumerada de los hechos esenciales sobre los cuales alega no existen controversias sustanciales. Estableció la relación entre los hechos propuestos, con los múltiples documentos que sometió, en apoyo a los mismos.[9]

Ahora bien, al revisar ponderadamente la *Oposición a Solicitud de Sentencia Sumaria Parcial* interpuesta por el apelante, nos percatamos de que, se limitó a refutar mediante alegaciones y conclusiones repetitivas, la *Moción de Solicitud de Sentencia Sumaria* presentada sobre alegada prueba de referencia y asuntos de credibilidad.[10] Al consignar su oposición a varias propuestas de hechos de BMI, el Sr. Toro descansó en su declaración jurada y extractos de su deposición.[11]  De otra parte, observamos que al admitir múltiples hechos incontrovertidos los enumeró de una forma distinta sin corresponder a los identificados en la moción de sentencia sumaría promovida por BMI.[12] A pesar de reconocer que, el Sr. Toro no acreditó la totalidad de las formalidades requeridas por la Regla 36, *supra*, somos de la opinión que, cumplió sustancialmente con las exigencias, al identificar porciones de distintas deposiciones y documentos para ilustrar sus fundamentos

---

[9] *Íd.*

[10] Apéndice, págs. 1303-1335.

[11] El apelante se opuso a las propuestas 13, 14, 17, 20, 25, 52, 53, 54, 55, 56, 57, 58, 60, 63, 66, 67, 68, 70, 71, 72, 74, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 97, 98, 99 y 100.

[12] Véase los identificados por el apelante como 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97 y 98. Estos números corresponden a los hechos incontrovertidos, propuestos en la moción de sentencia sumaria, identificados con los siguientes números; 1,2,3,4,5,6,7,8,9,10,11,12,15,16,18,19,21,22,23,24,26,27,28,29,29,30,31,32,33 34,35,36,37,38,39,40,41,42,43,44,45,46,47,48,49,50,51,61,62,64,65,69  y  96. Apéndice págs. 109-127.

e intentar contrarrestar los hechos propuestos por BMI, por lo que, no procedería revertir la determinación judicial recurrida bajo esta consideración.[13]

Superado lo anterior, nos corresponde determinar si existen controversias medulares que impidan la adjudicación sumaria para luego evaluar la aplicación del derecho en la presente causa. Coetáneo a ello, atenderemos los señalamientos de error presentados por el apelante.

En su recurso, el apelante señala como primer error que el foro primario dirimió cuestiones de credibilidad en el *ratio decidendi* de la sentencia sumaria. Por el contrario, el apelado argumenta que, el foro primario no adjudicó credibilidad alguna en su dictamen. También, señala el apelado que, el Sr. Toro descansa en generalidades y carece de especificidad. En ese sentido, alega que no pudo precisar que evidencia faltaba en el récord y tampoco indicó que hechos medulares permanecían en controversia.

Conforme la normativa antes reseñada, si bien es cierto que no es aconsejable utilizar el mecanismo de sentencia sumaria cuando el factor de credibilidad es un elemento determinante, no supone una prohibición absoluta. Es decir, nada impide el uso de la sentencia sumaria, cuando de los documentos a ser considerados en el petitorio sumario surge que, no existe controversia de hechos materiales. Inclusive, nuestro ordenamiento jurídico ha permitido la utilización de dicho mecanismo en casos laborales cuando no existen controversias de hechos medulares. *Ramos Pérez v. Univisión*, supra.

Tras un análisis exhaustivo y mesurado del voluminoso expediente y en particular, los documentos anejados a las respectivas mociones, no surge que el TPI haya adjudicado asuntos de credibilidad o intención como lo arguye el apelante. Los

---

[13] *Íd.*

documentos incluidos junto a la moción de sentencia sumaria de BMI sostienen las determinaciones de hechos consignados por el foro primario. El Sr. Toro no logró rebatir hechos relacionados a su falta de cumplimiento con las políticas internas de quien fuera su patrono. A modo de ejemplo, observamos que el apelante fundamentó la mayoría de sus objeciones a las propuestas de hechos por entender que eran basadas en prueba de referencia y asuntos de credibilidad. De nuestro análisis colegimos que, el argumento del Sr. Toro en cuanto a la credibilidad, carece de especificidad y mérito. Destacamos que, los tribunales apelativos estamos en igual posición que el foro sentenciador al revisar un petitorio sumario. Tal y como reseñamos previamente, nuestra última instancia judicial ha resuelto que, el oponente debe controvertir la prueba presentada con evidencia sustancial y no puede simplemente descansar en sus alegaciones. *Ramos Pérez v. Univisión, supra* a las págs. 215-216 (2010). **Las meras afirmaciones no bastan**. *Íd.* (Énfasis nuestro). Como regla general, para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar **contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos presentados por el promovente.** *Íd.,* pág. 215. (Énfasis nuestro). En otras palabras, quien se opone a que se declare con lugar una solicitud de sentencia sumaria viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente, según exigido por la Regla 36.3 de Procedimiento Civil, *supra.* Resulta evidente que, el apelante no ofreció contradeclaraciones juradas o contradocumentos en aras de controvertir los hechos medulares promovidos por BMI en este caso.

Surge del expediente que, el Sr. Toro admitió que era el responsable de monitorear que cada empleado estuviese

cumpliendo con sus tareas en el Dominio.[14] A su vez, aceptó que BMI tenía una serie de manuales y reglamentos que de ser incumplidas podían provocar el despido.[15] Admitió que, anteriormente, habían ocurrido varios señalamientos sobre el problema de espacio.[16] Es decir, que lejos de negar lo sucedido, el demandante expresó que, no era la primera ocasión, que recibía quejas y señalamientos sobre asuntos relacionados a la seguridad en el Dominio.[17] Por otro lado, en su deposición aceptó haberle dado instrucciones a la Sra. Wilmarie Plaza de publicar en la aplicación de "Whattsapp" una foto del equipo que fue mal ubicado y que provocó el problema de seguridad.[18]

De otra parte, surge del expediente que, la queja presentada por el Sr. Miguel Rivera fue la primera ocasión en que una querella relacionada al asunto de seguridad escalaba hasta el área de recursos humanos.[19] Sin embargo, también se desprende de los documentos presentados que, el Sr. Toro conocía sobre las preocupaciones de sus supervisados antes de que se iniciara la investigación y se limitó a objetar a que no siguieran la cadena de mando. El apelante no ofreció contradeclaraciones y contradocumentos que pusieran en controversia los hechos esenciales presentados por BMI sobre su falta de acción y actos gerenciales fehacientes en aras de atender la problemática conforme las expectativas de BMI. Es decir, a pesar de nuestra evaluación *de novo* de la totalidad de los documentos presentados no se identificó documento alguno que contrarrestara la afirmación del patrono que, el Sr. Toro no actuó de manera efectiva y con premura para resolver los asuntos traídos ante su atención por los empleados supervisados por él. Cabe señalar que, aun cuando se desprende del expediente

---

[14] Apéndice, págs. 1322.
[15] Apéndice, págs. 194, 1322-1324.
[16] *Íd.*, págs. 240-243.
[17] *Íd.*
[18] *Íd.*, págs. 256-257.
[19] *Íd.*, pág. 242.

que, el Sr. Toro realizó una reunión sobre el incidente con el Sr. Miguel Rivera, el apelante no logró rebatir el hecho que la situación con el espacio y la seguridad ocurría con anterioridad a la queja presentada en su contra y no actuó conforme la política y normativa establecida por BMI. Colegimos que, lo antes resulta insuficiente para controvertir los hechos que demuestran los sucesos que provocaron el despido y mucho menos representan asuntos de credibilidad que obliguen la celebración de un juicio en su fondo.

Por otro lado, en su segundo señalamiento de error, el apelante sostiene que la prueba utilizada por el foro primario para arribar a sus conclusiones constituye prueba de referencia inadmisible. Arguyó que, las declaraciones juradas presentadas en la sentencia sumaria constituyen documentos "self-serving" de personas que no tienen conocimiento personal. No le asiste la razón. Nos explicamos.

Las declaraciones juradas cuestionadas por el apelante fueron realizadas por la Sra. Amanda Price y la Sra. Laureen Lunsford, del departamento de recursos humanos de BMI, quienes a su vez realizaron la investigación interna que, posteriormente, provocó el despido del Sr. Toro. Tanto la Sra. Amanda Price y la Sra. Laureen Lunsford, respectivamente, informaron sobre la investigación interna y el resultado de las 14 entrevistas realizadas a los empleados supervisados por el apelante. Explicaron cuáles actos había cometido el apelante, que son contrarias a las normas de integridad establecidas en BMI. Evaluado el informe, concluimos que, cualifica como récord de negocios, conforme dispone la Regla 902 (K) de Evidencia, *supra*. En especial, el *Informe Investigation Cases #378* fue preparado como una actividad regular de negocio, mediante el mecanismo de investigación de BMI.[20]

---

[20] *Íd.*, págs. 327-334.

Además, no solo surge que el informe realizado cumple con la Regla 805 (f) de Evidencia, *supra*, sino que la prueba documental que utilizó BMI en su moción de sentencia sumaria fue preparada por dichas empleadas, contemporáneamente a los hechos y en el curso ordinario de las labores que ejercían para BMI.

De otra parte, la propia Regla 805 (f) de Evidencia, *supra*, permite que se presente una certificación que cumpla con la Regla 902 (k), *supra*, de dicho cuerpo reglamentario para autenticar el informe investigativo. Al examinar esta última Regla, colegimos que, las declaraciones juradas provistas por las empleadas de BMI cumplen, específicamente, con los propósitos que persiguen ambas reglas; imprimirle confiabilidad a prueba que pudiese constituir prueba de referencia inadmisible y, por tanto, una excepción a dicha prueba de exclusión.

En específico, las declaraciones juradas de la Sra. Amanda Price y la Sra. Laureen Lunsford demuestran: (1) que la investigación fue realizada cercano al momento en que ocurrieron los sucesos; 2) la investigación fue llevada a cabo en el curso de una actividad realizada con regularidad y; 3) que la investigación fue preparada como una práctica regular de la actividad. Como puede verse, aunque las personas que preparen el informe no tengan conocimiento personal, la precitada regla sólo exige que, la persona que ofrezca algún tipo de información para la preparación del informe tenga conocimiento personal de lo narrado. En el recurso de autos, las personas que fueron entrevistadas por las empleadas de recursos humanos tenían conocimiento personal de lo investigado.

De conformidad con lo anterior y de los documentos que surgen del expediente, no hallamos presentado prueba de referencia inadmisible. Los informes presentados y preparados por la Sra. Amanda Price y la Sra. Laureen Lunsford demuestran que los declarantes expusieron hechos que le constaban de propio y

personal conocimiento, puesto que participaron de procesos relacionados con su labor en BMI. Añádase que, el apelante cuestiona que el informe de recursos humanos fue rendido después de haberse entregado la carta de despido. Ahora bien, de un examen cuidadoso del expediente podemos considerar que, la mayoría de la investigación y las entrevistas a los empleados fueron iniciadas y realizadas con anterioridad a la fecha del despido, por lo que, distinto a la apreciación del apelante, lo antes no derrota la eficacia del pronunciamiento judicial apelado. Por todo lo cual, no se cometió el segundo señalamiento de error.

En el tercer error, el apelante argumenta que el foro primario erró al no atender las alegaciones sobre expoliación de la prueba. En particular, el Sr. Toro adujó que guardaba información y apuntes sobre su trabajo en unas libretas. Indicó que utilizaba los canales de Teams para crear un registro de las reuniones que sostenía con los empleados. A esos efectos, le atribuye a BMI haberle ocultado evidencia que le favorece y, por ende, hubo expoliación de prueba. No le asiste la razón. Veamos.

Como ya indicamos, la Regla 34 de Procedimiento Civil, *supra*, aborda las controversias en torno al descubrimiento. En específico, la Regla 34.2, 32 LPRA Ap. V, R.34.2, establece que, luego de que la parte promovente haya realizado con prontitud esfuerzos razonables y de buena fe con la parte adversa y ésta se niega a descubrir lo solicitado, la parte promovente de una moción bajo esta regla, podrá requerir al tribunal que, dicte una orden para que se obligue a la parte promovida a descubrir lo solicitado.

Según surge del expediente, iniciado el pleito, el Sr. Toro envió una solicitud de producción de documentos a BMI.[21] Mediante esta, solicitó ciertos documentos de manera amplia y general.[22] En

---

[21] Entrada Núm. 20 del Sistema Unificado de Manejo y Administración de Casos (SUMAC).
[22] Apéndice pág., 2331-2333.

respuesta, BMI cursó su correspondiente contestación.[23] Cabe destacar, sin embargo, que no es hasta el 9 de junio de 2023, que la representación legal del Sr. Toro, envía un correo electrónico requiriendo específicamente las libretas profesionales y los canales de Teams.[24] Surge de los autos que, el 24 de agosto de 2023, BMI envió un email informando que BMI le brindó la oportunidad al Sr. Toro, en al menos dos ocasiones de buscar sus cosas personales en la oficina. No obstante, puntualizaron que las pertenencias que no se llevó consigo, fueron descartadas.[25] En cuanto al canal de Teams, indicaron que la compañía BMI no conserva datos de los canales de comunicación.[26] De lo antes apreciamos que, el descubrimiento de prueba inició en el año 2021 y el 9 de junio de 2023 el Sr. Toro presentó objeciones a la contestación a interrogatorio y solicitó la producción de las libretas personales y canales de Teams. No surge trámite ulterior ante el TPI al respecto. El correo electrónico enviado en agosto de 2023 no surge como parte de ninguna moción ante el foro primario en esa etapa de los procesos. De lo anterior se desprende, que no es hasta aproximadamente dos años luego de haberse iniciado el pleito, que el Sr. Toro le requiere específicamente a BMI las libretas y canales.

En atención a lo anterior, destacamos que, la Regla 34.3 de Procedimiento Civil, *supra*, es clara al indicar que si la parte promovente (en este caso el apelante) justifica con prueba fehaciente que la parte promovida (en este caso el BMI) ha incumplido con su deber de preservar prueba pendiente de litigio o razonablemente utilizable en un pleito futuro estará sujeto a sanciones. Como se sabe, nuestro ordenamiento jurídico obliga a las partes a la preservación de la prueba y su destrucción puede provocar la

---

[23] *Íd.*
[24] Apéndice pág., 2334.
[25] Apéndice pág., 2335.
[26] *Íd.* 4

imposición de sanciones, entre otras consideraciones. No obstante, para que el foro primario pueda imponer alguna sanción, el promovente deberá demostrar con especificidad y prueba fehaciente que la otra parte se niega a entregar lo solicitado por haberlo destruido o incumplido.

Luego de un análisis concienzudo, colegimos que, el Sr. Toro no colocó en condiciones al foro primario de pasar juicio sobre la alegada expoliación de evidencia. Según surge del recurso de autos, el apelante no le solicitó al TPI una orden al amparo de la Regla 34, *supra*, o una vista evidenciaria a los efectos de que, el TPI pudiera evaluar lo alegadamente ocultado por BMI. Tampoco acreditó una moción al amparo de la Regla 36.6 de las Reglas de Procedimiento Civil para posponer la adjudicación del petitorio sumario sobre tales bases. Por el contrario, colegimos que, el Sr. Toro descansó en generalidades y omite indicar qué información contienen las libretas y el canal de Teams, que propicie el acto de derrotar las propuestas de BMI, adoptadas como determinaciones de hechos consignadas por el TPI. Además, el Sr. Toro no ha podido demostrar que BMI destruyó intencionalmente la alegada evidencia. De todas maneras, al examinar el hecho número 25 de la sentencia apelada, se establece que BMI efectuó y cumplió el mismo protocolo aplicable para el despido de empleados en el proceso seguido con el Sr. Toro. Lo antes no fue correctamente rebatido por el apelante ya que este se limitó a "negar" la referida propuesta (adoptada como hecho número 25) y no presentó prueba para controvertir lo establecido por BMI. El tercer error señalado no fue cometido.

Por último, en lo concerniente al cuarto error, el apelante argumenta que el foro primario incidió al concluir que el apelante no puede valerse de la presunción establecida en la Ley Núm. 80, *supra*, y por lo tanto, el Sr. Toro tenía el peso de la prueba. No le asiste la razón.

El Tribunal Supremo determinó en *Ortiz Ortiz v. Medtronic*, supra, que para poder determinar si aplica o no la presunción de la Ley Núm. 80, *supra*, debe analizarse cuando acontecen los hechos que dan lugar a la causa de acción por despido injustificado. Según surge del expediente de autos, el despido del Sr. Toro ocurrió el 10 de mayo de 2021. Por lo cual, la causa de acción por despido injustificado surge con posterioridad a la aprobación de la Ley Núm. 4, *supra*. Por consiguiente, el foro primario actuó correctamente al determinar que el Sr. Toro no puede beneficiarse de la presunción establecida al amparo de la Ley Núm. 80, *supra*, sobre despido injustificado y, por lo tanto, carga con el peso de la prueba. En conclusión, el cuarto error señalado no fue cometido.

Por último, en ausencia de controversias medulares, nos corresponde evaluar *de novo,* si el foro primario cometió algún error en la aplicación del derecho.

Al entender sobre la presente causa apreciamos que, las conclusiones de derecho a las que arribó el foro primario en la *Sentencia* apelada se ajustaron específicamente a la correcta interpretación y aplicación de las normas jurídicas según la evidencia que tuvo dicho foro ante sí. El despido del apelante efectuado por BMI se ajustó a los requerimientos jurídicos que rigen en materia laboral, pues la investigación exhaustiva demostró que el Sr. Toro incumplió con las expectativas de BMI sobre las funciones de su puesto de supervisor, así como con las normas y políticas establecidas por BMI.[27]

En suma, debido a que mediante hechos incontrovertidos BMI demostró justa causa para el despido del Sr. Toro, en virtud de la Ley Núm. 80, *supra*, y la ausencia de un acto de represalias conforme la Ley 115, *supra*, concluimos que, el TPI actuó correctamente al desestimar la presente causa por la vía sumaria.

---

[27] Apéndice, págs. 327-334.

**IV.**

Por los fundamentos antes expuestos, se confirma la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones